IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LINCOLN COMPOSITES, INC.,<br><br>                Plaintiff,<br><br>vs.<br><br>FIRETRACE USA, LLC,<br><br>                Defendant. | 4:12-CV-3142<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on defendant Firetrace's Motion for Remittitur and for New Trial. Filing 105. For the reasons discussed below, Firetrace's motion will be denied.

## I. BACKGROUND

Plaintiff Lincoln Composites, Inc. ("Lincoln") manufactures equipment for storing and transporting natural gas. One of the products Lincoln manufactures is the "Titan Module." As typically sold, the Titan Module consists of four large tanks, assembled into a single framework. It is used for bulk transportation of compressed natural gas, and is primarily marketed to overseas customers. Firetrace manufactures fire detection equipment, including "fire detection tubing."

Lincoln decided to use Firetrace's tubing as part of the fire detection system in its Titan Modules. From around 2008 to 2012, Firetrace worked with Lincoln to supply it with tubing. Throughout this period, Lincoln noticed certain defects in the tubing, which caused it to become brittle or break. Each time a new defect arose, Firetrace attempted to fix it, and Firetrace provided Lincoln with replacement batches of tubing. But defects continued to arise, and around May 2012, Lincoln determined that it was no longer going to do business with Firetrace. Lincoln then brought this suit. Lincoln claims that Firetrace failed to provide non-defective tubing in a timely fashion, in breach of the parties' contract and certain express and implied warranties contained therein.

That there was a contract for the purchase and delivery of Firetrace tubing was not disputed. The terms of that contract, however, were very much in dispute. Lincoln argued that the contract consisted of the terms and conditions contained on Lincoln's website and referenced in purchase orders

it sent to Firetrace. Firetrace contended that it had delivered its own terms and conditions to Lincoln, and that these formed the basis of the parties' contract. Lincoln denied receiving a copy of Firetrace's terms prior to forming the contract, and Firetrace disputed that Lincoln's terms and conditions were actually available on its website during the relevant period. Firetrace's terms provided an express warranty, but disclaimed all implied warranties, and limited Lincoln's remedies to repair or replacement of any defective tubing. Lincoln's terms contained an express warranty, which was silent on implied warranties, and contained no limitation of remedies. Lincoln argued that, even if Firetrace's terms controlled, any repair and replacement remedy had failed of its essential purpose, entitling Lincoln to seek the full range of damages and pursue its claims for breach of the implied warranties.

The case proceeded to a jury trial. Following an 8-day trial, the jury returned a verdict in favor of Lincoln on its claim for breach of express warranty, in the amount of $920,277.76.

## II. STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 59, the Court may grant a new trial when the first trial resulted in a miscarriage of justice, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial. *Trickey v. Kaman Indus. Technologies Corp.*, 705 F.3d 788, 807 (8th Cir. 2013). With respect to legal errors, a "miscarriage of justice" does not result whenever there are inaccuracies or errors at trial; instead, the party seeking a new trial must demonstrate that there was prejudicial error. *Id.* Generally speaking, Firetrace argues that it is entitled to a new trial because (a) the verdict, as to elements of both liability and damages, was against the great weight of the evidence; and (b) the Court erred in instructing the jury.

### A. SUFFICIENCY OF THE EVIDENCE

A motion for a new trial should only be granted if the jury's verdict is against the great weight of the evidence so as to constitute a miscarriage of justice. *Bank of America, N.A. v. JB Hanna, LLC*, 766 F.3d 841, 851 (8th Cir. 2014). In determining whether a verdict is against the weight of the evidence, the Court can rely on its own assessment of the evidence—it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict. *Harris v. Secretary, U.S. Dept. of the Army*, 119 F.3d 1313, 1318 (8th Cir. 1997); *see also Boesing v. Spiess*, 540 F.3d 886, 890 (8th Cir. 2008). However, the Court may not reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because the Court feels that another result is more reasonable. *Boesing*, 540 F.3d at 890; *Harris*, 119 F.3d

at 1318. Because this is a diversity action, whether the jury's verdict was against the great weight of the evidence is judged in accordance with substantive state law. *JB Hanna*, 766 F.3d at 851.

### B. JURY INSTRUCTIONS

A new trial may be appropriate when a jury has been improperly instructed. *See, e.g., McKay v. WilTel Commc'n Sys., Inc.,* 87 F.3d 970, 976 (8th Cir. 1996). The Court examines whether, taken as a whole and viewed in the light of the evidence and applicable law, the instructions fairly and adequately submitted the issues in the case to the jury. *Gill v. Maciejewski,* 546 F.3d 557, 563 (8th Cir. 2008). A party is entitled to an instruction on its theory of the case so long as it is legally correct and there is factual evidence to support it. *Boesing,* 540 F.3d at 890. But the instructions need not be technically perfect, *Gill,* 546 F.3d at 563, and a party is not entitled to any particular wording in the instructions. *Ryther v. KARE 11,* 108 F.3d 832, 847 (8th Cir. 1997). Erroneous jury instructions entitle a party to a new trial only if the error affected the party's substantial rights. *Id.* at 846.

## III. ANALYSIS

Firetrace argues that it is entitled to a new trial as to liability and damages on the sole claim decided by the jury: Lincoln's claim for breach of express warranty. Firetrace contends that Lincoln failed to present sufficient evidence in support of several aspects of its claim and argues that the Court erred in instructing the jury. Before turning to each of Firetrace's arguments, it will be helpful to put them in some context.

As noted above, Lincoln's claims required the jury to determine the terms of the parties' contract. This was a multi-step undertaking that required the jury to make a number of factual determinations. Depending on the jury's determination at one step, the inquiry at the next step might be different. For example, the jury first had to decide whether Firetrace had actually provided a copy of its terms and conditions in a timely manner, and whether Lincoln's terms and conditions were actually available on Lincoln's website at the relevant time. If the jury had found that neither parties' terms and conditions were available, there would have been no express warranty. So, the jury might have found that only one party's terms were incorporated into the contract. Or the jury might have found that both sets of terms were in play, which would mean that the jury was confronted with a "battle of the forms" situation governed by § 2-207 of the Uniform Commercial Code.

In instructing the jury, the Court considered each of the possible factual findings that the jury could make. Based on the jury's decision at each step, the instructions then guided the jury to the next decision that it would

need to make, and supplied the corresponding legal principles to apply. The Court did this by structuring its instructions as a decision tree or flowchart. And to aid the jury in navigating these instructions, the Court provided an actual graphical representation of the instructions, as a flowchart.[1] *See* filing 88.

The parties did not request a special verdict form, and thus the precise route that the jury took to reach its verdict is not known. So, Firetrace has drafted its motion for a new trial to cover each of the possible routes that the jury took. The Court has reviewed each of Firetrace's arguments, and finds that, regardless of the route the jury took to reach its verdict, its decision was supported by sufficient evidence and based on proper instructions.

### A. TERMS AND CONDITIONS ON LINCOLN'S WEBSITE

In finding that Firetrace breached an express warranty to Lincoln, the jury may have determined that Lincoln's terms and conditions were available on its website, and that the express warranty found therein formed a part of the contract. Firetrace argues that, if that was the jury's decision, then the verdict was fatally flawed, as Lincoln did not provide any evidence from which the jury could have concluded that Lincoln's terms and conditions were available on its website during the relevant period. The evidence is to the contrary. Lincoln provided sufficient evidence for the jury to find that its terms were available on its website during the relevant period.

Each of the numerous purchase orders that Lincoln sent to Firetrace contained a notice that any contract was subject to Lincoln's terms and conditions, which were available on Lincoln's website. *See, e.g.*, exh. 26; exh. 32; exh. 221. This occurred on at least 10 purchase orders, from the first order issued in 2008 all the way through 2012. *See* filing 101 at 5–7, 41–42; *see, e.g.*, exh 221 at 1 [Bates no. HL00609]; exh 32. Lincoln presented testimony from Jessica Yockey, who worked as a purchasing agent for Lincoln from November 2008 onward, and eventually as the agent who handled all of Lincoln's transactions with Firetrace. Filing 101 at 3, 7, 10; *see also* exh 221 at 4. Yockey testified that Lincoln's terms and conditions, exh. 57, had remained the same for the entire time she worked with Lincoln.

---

[1] Although not asserted as an independent ground for a new trial, Firetrace argues generally that the instructions as a whole were "complicated and confusing" and speculates that the jury must have been confused because they only took 3 hours to deliver a verdict. Filing 106 at 10. The Court has more faith in the jurors' abilities, and views their prompt, but by no means hasty, deliberations as evidence that the instructions were actually helpful. Moreover, Firetrace did not object to the overall construction of the instructions, nor to the use of a flowchart. In fact, both parties appeared to find the flowchart useful in framing their closing arguments.

Filing 101 at 6. And the terms and conditions themselves showed a revision date of October 2005. Exh. 57. While Yockey testified that she did not personally check to ensure that Lincoln's terms were available on its website before she issued each purchase order, she stated that she trusted the terms were, in fact, available on Lincoln's site. Filing 101 at 42. There was no evidence that the terms were not available, or that Firetrace had tried to access them and failed. This was a question for the jury, and based on the evidence, the jury could reasonably have inferred that Lincoln's terms were available on its website during the relevant period.

The result would be the same even if the jury determined that Lincoln's terms were not posted on its website on all occasions. The undisputed evidence shows that, through a series of purchase orders issued over approximately 4 years, Firetrace was put on notice that Lincoln's terms existed. *See, e.g.*, exh. 26; exh. 32; exh. 221. In general, a party is charged with knowledge of the contents of a writing when he signs it and cannot avoid a contract simply because he failed to read the entire writing, including matters incorporated by reference. *See, e.g.*, *In re Int'l. Profit Assocs., Inc.*, 286 S.W.3d 921, 923–24 (Tex. 2009); *Ray Tucker & Sons, Inc. v. GTE Directories Sales Corp.*, 571 N.W.2d 64, 68 (Neb. 1997). Even if the terms were possibly not available on the website at all times, Firetrace was on notice that they existed, and could have requested a copy. As such, Lincoln's terms remained binding on Firetrace. *See*, *Int'l. Profit Assocs.*, 286 S.W.3d at 923–24; *Ray Tucker & Sons*, 571 N.W. 2d at 68–69.

B. FIRETRACE'S EXPRESS WARRANTY FAILED OF ITS ESSENTIAL PURPOSE

Alternatively, the jury may have found that Firetrace breached its own express warranty. As noted above, that warranty limited Lincoln's recourse to repair or replacement of any defective tubing and excluded consequential and incidental damages. *See* exh. 27. If that was the jury's decision, then the jury necessarily found that the limited remedy failed of its essential purpose. Firetrace argues that any such finding was not supported by sufficient evidence, and contends that the Court erred in instructing the jury on this point.

1. Sufficiency of the Evidence

Under the U.C.C., a seller is free to establish exclusive, limited written warranties and limit the availability of damages. Neb. U.C.C. § 2-719; *John Deere Co. v. Hand*, 319 N.W.2d 434, 437 (Neb. 1982). So, repair and replacement warranties and clauses excluding consequential damages are allowed. *John Deere Co.*, 319 N.W.2d at 437. However, Neb. U.C.C. § 2-719(2) also provides that, "[w]here circumstances cause an exclusive or limited

remedy to fail of its essential purpose, remedy may be had as provided in the Uniform Commercial Code." The comments to § 2-719 explain that "where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this article." Neb. U.C.C. § 2-719 cmt. 1.

The purpose of an exclusive repair or replacement remedy is to give the buyer goods which conform to the warranty within a reasonable time after a defect is discovered. *John Deere Co.*, 319 N.W.2d at 437. Where the seller is given a reasonable chance to correct defects and the equipment still fails to function properly, the limited remedy fails of its essential purpose. *Id.* In such an event, the buyer may invoke any remedies available under the Uniform Commercial Code. *Id.* These include consequential and incidental damages, Neb. U.C.C. § 2-714(3), even when such damages were specifically excluded by the warranty. *John Deere Co.*, 319 N.W.2d at 437.

Lincoln adduced ample evidence that any limited remedy failed of its essential purpose. For example, Lincoln presented the testimony of Don Baldwin, an engineering director who worked at Lincoln, on the Titan Modules, from 2008 onward. Filing 110-3 at 5–6. Baldwin described the repeated, distinct failures of the tubing, and Firetrace's multiple, unsuccessful attempts to provide defect-free tubing over a period of approximately 18 months. *See* filing 110-3 at 28–31, 38–41. Lincoln also provided testimony from Dr. Paul Gramann, an expert in engineering and plastics. Filing 82 at 1–14. Gramann explained, in great detail, how and why the tubing had failed, testifying that the failures were the result of manufacturing defects. *See* filing 82 generally and at 60–67. And Gramann predicted that the remaining Firetrace tubing in the field would, at some point, suffer similar failures. Filing 82 at 66–67.

As Baldwin put it, after more than a year and several different "fixes" that did not work, Lincoln was entitled to conclude that "[e]nough is enough." Filing 110-3 at 40. The evidence was not one-sided; Firetrace had its own expert testify, and adduced other evidence, that the tubing's defects were due to problems that were being remedied in the ongoing manufacturing process. But based on the evidence adduced at trial, the jury could reasonably have found that Firetrace had not held up its end of the warranty within a reasonable time. And this left Lincoln with a substantial amount of tubing that was essentially worthless. This was a question for the jury, and the jury

could reasonably have concluded that Lincoln had been substantially deprived of the benefit of its bargain.[2]

### 2. Jury Instructions

Firetrace takes issue with jury instruction no. III-4, which told the jury how to decide if Firetrace's limited repair and replacement remedy had failed of its essential purpose. *See* filing 88 at 26. At the outset, the Court notes that Firetrace failed to make a timely object to this instruction.

To preserve any objection to an instruction, or the Court's refusal to give an instruction, Firetrace was required to object at the final jury instruction conference. *See* Fed. R. Civ. P. 51(b)-(c). The Court conducted a comprehensive informal jury instruction conference, at which both parties' concerns were addressed. As a result of this informal conference, modifications were made to various instructions, including no. III-4. At the final, formal instruction conference, Firetrace stated on the record that it had no objections to instruction no. III-4. Filing 103 at 8. Firetrace had earlier objected to Lincoln's proposed instruction on failure of essential purpose, and suggested its own version. *See*, filing 65 at 20; filing 68 at 5; filing 72 at 5. But that was not a substitute for objecting at the final conference. The duty to object at the final conference exists in order to give district courts the opportunity to correct errors before submitting the case to the jury, and, relatedly, to prevent a losing party from obtaining a new trial by pointing out an error only after receiving an unfavorable verdict. *Moore v. Am. Family Mut. Ins. Co.*, 576 F.3d 781, 786 (8th Cir. 2009).

Because it did not object, Firetrace has waived any objection, absent a showing of plain error. *See,* Fed. R. Civ. P. 51(d)(2); *Niemiec v. Union Pac. R.R. Co.*, 449 F.3d 854, 858–59 (8th Cir. 2006). Plain error exists if: (1) the Court deviated from a legal rule; (2) the error is clear under current law; and, (3) the error affects substantial rights, which ordinarily means that the error affects the outcome of the proceedings. *Bauer v. Curators of Univ. of Mo.*, 680 F.3d 1043, 1045 (8th Cir. 2012). And plain error will not be corrected unless

---

[2] In a related vein, Firetrace argues that a new trial is warranted based on the Court's denial of its motion for summary judgment. In that motion, Firetrace argued that there was no evidence from which a reasonable jury could conclude that the limited remedy had failed of its essential purpose. *See,* filing 33; filing 40 at 16–19; filing 60. But as the Court has explained, there was sufficient evidence to support such a finding, and Firetrace's motion for summary judgment was properly denied. And in any event, a motion to alter or amend the judgment under Rule 59 is not a proper vehicle for attacking a denial of a motion for summary judgment, as such a denial does not result in any judgment which can be altered or amended. *See Moodie v. Fed. Reserve Bank of N.Y.*, 835 F. Supp. 751, 752 (S.D.N.Y. 1993); *see also James v. Nebraska,* 2011 WL 5553634, at *1 (D. Neb. Nov. 15, 2011).

(4) it seriously affected the integrity, fairness, or public reputation of judicial proceedings. *Id.* The Court has reviewed the instructions and finds no error that would have "misled the jury or had a probable effect on the jury's verdict." *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft,* 434 F.3d 1081, 1093 (8th Cir. 2006).

Instruction no. III-4 provided, in relevant part:

> To show that the limited remedy of repair and replacement has failed of its essential purpose, Lincoln Composites must prove all of the following elements by the greater weight of the evidence:
>
>   1.  That Lincoln Composites provided Firetrace with a reasonable opportunity to fix the defects in the tubing;
>
>   2.  That despite Firetrace's attempts to fix the defects or provide replacement tubing, the tubing still failed to function properly; and
>
>   3.  That this deprived Lincoln Composites of the substantial value of its contract with Firetrace.
>
> It is for you to decide how many attempts were needed, and what was a reasonable time frame in which to remedy the defect, before the remedy would fail of its essential purpose, if it did.

Filing 88 at 26.

Firetrace argues that, in place of the final sentence quoted above, the Court should have instructed the jury that:

> The mere fact that a defect is not properly remedied after the first attempt, or even multiple attempts to repair or replace it does not mean the warranty failed its essential purpose. Additionally, if Defendant stands ready to perform, there is no failure of essential purpose, even though the buyer remains highly unsatisfied with the results obtained by the limited remedy. Finally, a repair or replace remedy does not fail of its essential purpose so long as repairs are made each time a defect arises.

Filing 72-1 at 2.

- 8 -

The Court rejected Firetrace's instruction in favor of its own instruction that was fair to both parties. The Court's instruction was a correct statement of the law, distilled from the Nebraska Supreme Court's thorough treatment of the subject in *John Deere Co.*, 319 N.W.2d at 437. As that case made clear, the key inquiry is whether Firetrace was given a "reasonable chance" to correct defects, and whether they did so within a "reasonable time." *Id*. What constitutes reasonableness in this context was a question for the jury, and it was a question the jury was equipped to answer with the plain language instruction that was given.

### C. SUFFICIENCY OF THE EVIDENCE: DAMAGES

Firetrace next argues that it is entitled to a new trial on the issue of damages,[3] as there was insufficient evidence to support the jury's damage award of $920,227.76. The parties did not request an itemized verdict form; but based on the amounts claimed by Lincoln, it is apparent that the total award was based on the following recoveries for Lincoln:

| | |
|---|---:|
| Purchase price of tubing | $857,334.48 |
| Some, but not all, of the expenses Lincoln had already incurred in replacing the tubing ("current replacement" costs) | 5,753.28 |
| The costs Lincoln estimated it would incur to replace tubing in 37 additional modules ("future replacement" costs) | + 57,140.00 |
| **Total** | **$920,227.76** |

*See* filing 106 at 10 n.5; filing 107-1 at 51–54.

The measure of a buyer's damages for a breach of warranty is the "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." Neb. U.C.C. § 2-714(2). In addition to these "direct" damages, a buyer may recover incidental and consequential damages. Neb. U.C.C. § 2-714(3). Firetrace objects to both components of the jury's damage award.

---

[3] More specifically, Firetrace asks the Court to condition denial of the motion for a new trial upon the plaintiff's agreement to remit the unsupported portion of the jury's award. *See, e.g.*, *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1328 (11th Cir. 1999).

### 1. Direct Damages

  The Court begins with Lincoln's direct damages: the difference between the value of the Firetrace tubing as delivered to Lincoln and the value of the tubing if it had been as warranted. Firetrace does not object to the Court's jury instruction on direct damages, which simply paraphrased § 2-714(2). *See* filing 88 at 33. And Firetrace agrees that the value of the tubing, if it had been as warranted, was the purchase price paid by Lincoln: $857,334.48. However, the jury credited Lincoln's evidence and found that the value of the defective tubing that Lincoln actually received was $0. Firetrace argues that this determination was not supported by the evidence. The Court finds that there was sufficient evidence, if believed by the jury, to support its conclusion.

  John Schimenti, Lincoln's president, testified as follows:

> Q.  [by Lincoln's attorney]: Now, Mr. Schimenti, were the products that were sold by Firetrace to Lincoln Composites of any value to Lincoln Composites?
> A.  No.
> Q.  We've already talked about some of the failures that have occurred and I think there's also been testimony that not all of the Firetrace tubing failed; is that correct?
> A.  That is correct.
> Q.  Ultimately, has Lincoln Composites made a decision as a company as to what it will do with the Firetrace product that is still installed in Titan Modules in the field?
> A.  Yes. We've made a decision that we will replace that material with our alternative approach which that is a cost to us.
> Q.  Is it your intent as the company to charge the customer for the replacement of the Firetrace tubing with the new system?
> A.  No.
> Q.  You already -- also indicated that there is certain unused Firetrace tubing that's located with Lincoln Composites, correct?
> A.  Yes.
> Q.  Is that unused stock of Firetrace tubing of any value to Lincoln Composites?
> A.  No, it's of the same lot that failed.

Filing 100 at 30–31.

- 10 -

Lincoln also presented evidence that it was not safe or prudent for its customers to continue using the Firetrace tubing in their existing Titan Modules, even when that tubing had not yet failed. In the event the tubing did break, it would trigger the Titan's fire detection system, which would trigger a release of all the natural gas stored in the module. Filing 109 at 10–12. As Baldwin explained:

> Q. [by Lincoln's attorney] There's also been discussion during the course of the trial about inadvertent releases of product from the Titan Module. Do you understand what's meant by an "inadvertent release"?
> A. Well, it -- I understand that to be a -- I would call it a false positive. Basically, it's acting like there's a fire when there's not one and releasing the gas.
> Q. Is that situation of concern to Lincoln Composites?
> A. Certainly. I mean, right now these modules can -- can operate anywhere in the United States. I think of, you know, if you have a truck sitting at 15th and O Street here in Lincoln and this were to happen, you'd be dumping 7400 kilograms of natural gas to atmosphere at that point. There would probably be evacuations of the neighborhood. You'd -- you'd probably close down a -- a nine square block area of downtown Lincoln if that were to happen.
>
> . . . .
>
> Q. Was there any decision made at Lincoln Composites with respect to the replacement of Firetrace tubing in existing modules?
> A. Yeah. I think we saw it as a -- a latent defect which basically could manifest itself at random time intervals and, therefore, the prudent thing to do was not continue to wait for failures to happen but to begin replacing it in the field.
> Q. And has that process continued since the time that decision was made to replace it in existing modules?
> A. Yes, it has. I believe we replaced it in all modules except the ones in Vietnam.

Filing 109 at 12, 40; *see also* filing 110-2 at 72:11–21.

Lincoln argued to the jury that, instead of serving its function as a safety device, the tubing presented a safety hazard. Lincoln's customers could disable the tubing—leaving their modules with no fire detection system. Or they could continue to use the tubing, subject to the risk that, at any time, the module might vent all of its natural gas into the surrounding area. Neither of these were attractive options. And as noted above, Gramann predicted that the remaining tubing would fail at some point. Filing 82 at 66–67. Faced with these obvious safety risks, Lincoln chose what it considered to be a reasonable alternative: it offered its customers a different fire detection system.

Firetrace counters by noting that the majority of the tubing had not failed. Again, this is a jury question, and given the safety risks posed by inadvertent release(s), the jury could reasonably have concluded that even a relatively low failure rate rendered the tubing too risky to use, and thus worthless.

Firetrace argues that the tubing must have been worth something, because Lincoln was able to sell Titan Modules containing the tubing at a profit, which Lincoln has not refunded. But that overlooks the fact that, when the modules were sold, the tubing's defective nature was unknown. Firetrace further argues that the jury's award would result in an unconscionable windfall or double recovery for Lincoln. Again, the evidence does not support the argument. If the tubing had been as warranted, Lincoln still would have incorporated it into its modules and made a profit. But Lincoln (and its customers) would have enjoyed the benefit of $800,000 worth of tubing that actually worked. As it stands, Lincoln paid over $800,000 for tubing that it ultimately had to replace. The jury's verdict did not result in a double recovery. Rather, it reflects a straight-forward application of Neb U.C.C. § 2-714(2): the difference between the value of the tubing as warranted and the value of the tubing as delivered.

In sum, there was sufficient evidence for the jury to reasonably conclude that the tubing, including the tubing which had not yet failed, was of no value to Lincoln.

2. Replacement Costs

Firetrace next argues that Lincoln failed to prove its future replacement costs to a reasonable degree of certainty. Those costs were based on the expenses Lincoln would have to incur to install new fire detection systems on 32 modules in Vietnam and 5 modules in Peru. *See* filing 80 at 96–99. Lincoln presented testimony from Ken Halvorsen, one of its engineers. Halvorsen estimated the costs to replace this tubing based on his previous trips to service Titan Modules in Vietnam and Peru. Filing 80 at 96–99.

Lincoln needed to present evidence sufficient to enable the jury to estimate the future replacement costs with a *reasonable degree* of certainty and exactness. *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 261 N.W.2d 358, 363 (Neb. 1978). Halvorsen's testimony provided that evidence. Firetrace points to the fact that Halvorsen provided only "estimates" and that no "rigorous study was undertaken." Filing 106 at 18. But Lincoln was only required to prove its damages to reasonable certainty, not "mathematical certainty." *El Fredo Pizza,* 261 N.W.2d at 363.

Firetrace next notes that Lincoln has been trying, since at least June 2013, to replace the fire detection systems in Vietnam, but has not yet succeeded in doing so. *See* filing 81 at 17–18. But Schimenti and Halvorsen both testified that it remained Lincoln's intent to replace those systems. Filing 100 at 31; filing 80 at 96. It was the jury's role to weigh this evidence, and the jury was entitled to conclude that Lincoln would ultimately replace those systems.

Finally, Firetrace argues that the Court erred in instructing the jury on these costs.[4] Firetrace asserts that the Court erred by instructing the jury that it could award damages for replacement expenses that Lincoln "might incur in the future," inviting the jury to base its decision on speculation and conjecture. Filing 106 at 17.

But the Court did not instruct the jury that it could award Lincoln costs that it *might* incur in the future. Instead, the Court instructed the jury that Lincoln could recover damages that were proximately caused by Firetrace's breach, filing 88 at 20, 22, 24, including any "reasonable expenses Lincoln Composites incurred or will be required to incur in replacing the tubing, as a result of any breach of warranty, including reasonable travel and labor expenses." Filing 88 at 33. And the Court cautioned the jury not to engage in speculation, guess, or conjecture, nor award any damages by way of punishment or through sympathy. Filing 88 at 33. These instructions correctly stated the law and equipped the jury to award only those damages supported by the evidence.

### D. INSTRUCTION ON SPOLIATION

Finally, Firetrace argues that the Court erred in refusing to offer its proposed adverse inference (spoliation) instruction. Firetrace failed to request such an instruction at the final jury instruction conference, *see* filing 103 at 12, and has waived any objection, absent a showing of plain error.

An adverse inference instruction is only warranted if the Court finds (1) that Lincoln intentionally destroyed evidence with a desire to suppress

---

[4] Firetrace did not object to this instruction. See filing 103 at 10.

the truth; and (2) prejudice to Firetrace. *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 460 (8th Cir. 2013). As the Magistrate Judge explained in her well-reasoned Memorandum and Order of September 26, 2014 (filing 62), Firetrace has failed to present any evidence that Lincoln destroyed tubing, or failed to retain it, with an intent to suppress the truth. That did not change at trial. Accordingly, Firetrace was not entitled to an adverse inference instruction, and the Court's refusal to give the instruction was not error, plain or otherwise.

## IV. CONCLUSION

Firetrace is not entitled to a new trial. The jury was properly instructed, and its verdict was supported by more than sufficient evidence. Accordingly,

IT IS ORDERED:

1. Firetrace's Motion for Remittitur and for New Trial (filing 105) is denied.

Dated this 2nd day of January, 2015.

BY THE COURT:

John M. Gerrard
United States District Judge